UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

|  |  |
|---|---|
| GATE PETROLEUM COMPANY, a Florida corporation, Plaintiff, v. INTERSTATE FIRE & CASUALTY INSURANCE COMPANY, an Illinois corporation, ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY, a Delaware corporation, EVANSTON INSURANCE COMPANY, an Illinois corporation, ASPEN SPECIALTY INSURANCE COMPANY, a North Dakota corporation, THE PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY, a Delaware corporation, and HALLMARK SPECIALTY INSURANCE COMPANY, an Oklahoma corporation, Defendants. | Civil Action No. 3:25-cv-00199-WGY-MCR |

YOUNG, D.J.[1]                                        May 27, 2026

**MEMORANDUM AND ORDER**

## I.      INTRODUCTION

Gate Petroleum Company ("Gate")[2] brings this suit against

six insurance companies -- Interstate Fire & Casualty Insurance

---

[1] Of the District of Massachusetts, sitting by designation.

[2] The Plaintiff describes itself as "Gate Petroleum Company, together with Gate Fuel Service, Inc., BFC Property Holdings, Inc., Gate North Carolina, Inc., Epping Forest Yacht Club, Inc., Ponte Vedra Corporation, Ponte Vedra Lodge, Inc., The River Club, Inc., Gate Precast Company, and Gate Precast Erection Co.,

Company ("Interstate"), Endurance American Specialty Insurance Company ("Endurance"), Evanston Insurance Company ("Evanston"), Aspen Specialty Insurance Company ("Aspen"), The Princeton Excess and Surplus Lines Insurance Company ("Princeton"), and Hallmark Specialty Insurance Company ("Hallmark")(hereinafter also collectively referred to as "Defendant Insurers"), seeking declaratory judgements, and claiming breach of contract by wrongful denial of coverage under their respective insurance policies and refusal to pay sums owed for Gate's alleged losses from COVID-19.

For the reasons stated below, Aspen, Evanston, Hallmark, and Princeton's Certain Defs.' Am. Joint Mot. Dismiss Pl.'s Am. Compl. ("Defs.' Am. Joint Mot. Dismiss" or "the Joint Motion to Dismiss"), ECF No. 80 is **ALLOWED**. Endurance's motion to dismiss, Def. Endurance's Mot. Dismiss & Mem. Law Supp. ("Endurance Mot. Dismiss" or "Endurance's Motion to Dismiss"), ECF No. 82, and Interstate's motion to dismiss, Def. Interstate's Mot. Dismiss & Mem. Law Supp. ("Interstate Mot. Dismiss" or "Interstate's Motion to Dismiss"), ECF No. 83, are each **DENIED**.

---

all of which (i) have assigned their claims against the Insurers to Gate Petroleum Company, and (ii) are Florida corporations whose principal places of business are located in Duval County, Florida." Am. Compl., ECF No. 52, ¶ 1 n. 1.

[2]

## II.   PROCEDURAL HISTORY

Gate first filed suit against Interstate, Endurance, Evanston, Aspen, Princeton, and Hallmark on February 26, 2025. Compl., ECF No. 1.  On June 26, 2025, Gate filed an amended complaint, Am. Compl., currently bringing thirteen counts against the Defendant Insurers:

- Count I seeks declaratory judgment against Interstate, stating that it is obligated to pay its share of Gate's alleged COVID losses under the Interstate Policies, id. ¶¶ 62–77; counts II and III allege breaches of the Interstate Primary and Excess Policies respectively.  Id. ¶¶ 78–83.

- Count IV requests that the Court enter a declaratory judgment against Endurance, stating that it is obligated to pay its share of Gate's alleged COVID losses, id. ¶¶ 84–99; count V alleges a breach of the Endurance Policy, id. ¶¶ 100–102.

- Count VI asks for a declaratory judgment against Aspen, stating it is obligated to pay its share of Gate's alleged COVID losses under the Aspen Policy, id. ¶¶ 103–114; count VII alleges a breach of that policy, id. ¶¶ 115–117.

- Count VIII asks the Court to enter a declaratory judgment stating that Evanston is obligated to pay its share of Gate's alleged COVID losses under the Evanston Policy, id. ¶¶ 118–129; count IX alleges a breach of that policy, id. ¶¶ 130–132.

[3]

- Count X asks for a declaratory judgment against Princeton, stating that it is obligated to pay its share of Gate's COVID losses under the Princeton Policy, id. ¶¶ 133-144; count XI alleges a breach of that contract, id. ¶¶ 145-147.

- Count XII requests declaratory judgment stating Hallmark is obligated to pay its share of Gate's COVID losses under the Hallmark Policy, id. ¶¶ 148-162; count XIII alleges a breach of that policy, id. ¶¶ 163-165.

Aspen, Evanston, Hallmark, and Princeton (hereinafter also collectively referred to as "Joint Movants") moved to dismiss Gate's first amended complaint. See Defs.' Am. Joint Mot. Dismiss. Endurance and Interstate each separately moved to dismiss Gate's amended complaint. See Endurance Mot. Dismiss; Interstate Mot. Dismiss. All the abovementioned motions to dismiss were filed on July 28, 2025.

The parties have fully briefed the matter. Gate's Opp'n Evanston, Aspen, Princeton, & Hallmark Mot. Dismiss ("Gate's Opp'n Am. Joint Mot. Dismiss"), ECF No. 102; Gate's Opp'n Endurance's Mot. Dismiss, ECF No. 103; Gate's Opp'n Interstate's Mot. Dismiss, ECF No. 104; Defs.' Joint Reply Supp. Am. Mot. Dismiss Am. Compl. ("Defs.' Joint Reply"), ECF No. 113; Joint Reply Interstate & Endurance Supp. Mots. Dismiss Gate's Am. Compl. ("Joint Reply Interstate & Endurance"), ECF No. 114.

[4]

This Court held a hearing on the Defendant Insurers' motions to dismiss on January 6, 2026.  Minute Entry, ECF No. 127.

## III.  FACTS ALLEGED

The facts are taken near verbatim from the amended complaint and are not quoted.  Gate brings this suit against the Defendant Insurers, alleging wrongful denial of coverage and refusal to pay sums allegedly owed under insurance policies for Gate's alleged losses from COVID-19.  Am. Compl. ¶ 1.

### A.    The Insurance Policies -- Overview

Interstate and Hallmark participated in a program of insurance for Gate spanning from November 15, 2018, to May 15, 2020, which Gate refers to as the "18-Month Manuscript."  Id. ¶ 12; see also Am. Compl., Ex. B ("18-Month Manuscript"), ECF No. 52-2.  Endurance, Interstate, Evanston, Aspen, and Princeton participated in a program of insurance that covered from May 15, 2019, to May 15, 2020, which Gate refers to as the "12-Month Manuscript."  Id. ¶ 13; see also Am. Compl., Ex. C ("12-Month Manuscript"), ECF No. 52-3.

Several other non-defendant insurers also participated in the insurance policies; collectively, all the insurers agreed to provide $200,000,000 worth of insurance for covered losses for Gate, subject to the terms, conditions, definitions, exclusions, and endorsements as modified or supplemented by each

[5]

participating insurer's individual policies.  Id. ¶¶ 12-14.  The insurers agreed to provide primary and excess insurance, the amounts of which varied from insurer to insurer.  Id. ¶¶ 15-21.  The insurance policies also contain an "Aggregate Exhaustion" provision, which requires excess insurers subscribing to coverage under that form to drop down in coverage when underlying insurance becomes exhausted or is otherwise unavailable to Gate.  Id. ¶¶ 55-57.

Among other coverages, the insurance policies contain a "Loss of Attraction" coverage, under which Gate brings its claim.  Id. ¶ 23.  The Loss of Attraction paragraph states:

> This policy covers the Actual Loss Sustained by the Insured during a period of liability from:
>
> **(1)  Infectious or contagious disease manifested by any person while on the premises of the Insured or within a radius of 50 miles thereof;**
>
> (2)  Actual or attempted murder or suicide occurring at the premises of the Insured;
>
> (3)  Injury or illness sustained by any person arising from or traceable to foreign or injurious matter in food or drink provided on the premises of the Insured or the threat thereof;
>
> (4)  Closing of the whole or part of the premises of the Insured by order of a competent public authority consequent upon the existence of threat of hazardous conditions either actual or suspected at the premises of the Insured;
>
> (5)  Loss of satellite transmission signals;

[6]

(6)   Interference in the use of or closure of any airport or any port facility within a radius of 250 miles of the insured location due to an investigation or otherwise by the Federal Aviation Administration, Civil Aeronautics Board, National Transportation Safety Board, or equivalent agency having jurisdiction to the extent such interference or closure is not otherwise insured by this policy;

(7)   Riot or civil commotion within a radius of 25 miles of the insured location; to the extent not otherwise insured under this policy such as under the clauses entitled: Interruption by Civil or Military Authority and Ingress/Egress;

The length of time for which loss may be claimed shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred and shall include the time required to make the premises conform to the order of a competed public authority, subject to any indemnity period if stipulated in the policy and beginning with the interruption or interference with the business.

See, e.g., 18-Month Manuscript 16-17; 12-Month Manuscript 16-17 (emphasis added).

B.    Gate's COVID Claims -- Loss of Attraction

Gate seeks coverage for alleged losses caused by COVID-19, which it claims are insured under the first provision of the Loss of Attraction paragraph. Am. Compl. ¶¶ 1, 23-39. Gate contends that COVID-19 is an "infectious or contagious disease" under any reasonable interpretation of those terms, as used in that provision. Id. ¶ 31. For its purposes, Gate understands

[7]

the term "manifested by" to mean "to become evident through the appearance of particular symptoms." Id. ¶ 32.

Gate claims that before March 15, 2020, at least one individual manifested symptoms of COVID-19 while at each of Gate's premises or within 50 miles thereof, as required under the first provision of the Loss of Attraction coverage. Id. ¶ 33. Gate further alleges that after the onset of the pandemic, between March 15, 2020, and December 31, 2021, these manifestations of COVID-19 numbered in the hundreds of thousands. Id. ¶ 34.

According to Gate, the company sustained losses exceeding $73,000,000 during the period from March 15, 2020 to December 31, 2021. Id. ¶¶ 34, 37-38. Gate alleges that each of the hundreds of thousands of COVID-19 cases constituted "manifestations" that, together, caused these losses, thus triggering the provision for infectious or contagious disease under the Loss of Attraction coverage. Id. ¶¶ 35-36. Gate submitted proof of loss to the Defendant Insurers, with the final proof submitted on February 8, 2023. Id. ¶ 39.

On March 21, 2024, Gate submitted Notices of Intent to Initiate Litigation to the Florida Department of Financial Services for each of the Defendant Insurers. Id. ¶ 58. None has paid Gate's alleged losses since these submissions. Id. ¶ 59.

[8]

### C.    Coverage Denials and Policy Exclusions

#### 1.    Interstate

On March 8, 2024, Interstate notified Gate via letter that it denied liability for Gate's alleged COVID-19 losses.  Id. ¶ 63.  Interstate relied on an endorsement called Alternus-MFOE-NA(4-17) US Market Follow-On Endorsement ("The Alternus Follow-On Endorsement") to deny coverage.  Id. ¶ 64.  The Alternus Follow-On Endorsement incorporates an exclusion for losses sustained from the release of "contaminants," which it defines as including "bacteria," "viruses," and "disease-causing or illness-causing agent[s]."  Id. ¶¶ 63-64; see also Am. Compl., Ex. E. ("Interstate Primary Policy") 53, ECF No. 52-5; id., Ex. F. ("Interstate Excess Policy") 54, ECF No. 52-6.[3]

According to Endorsement 9 to the 18-Month Manuscript or the 12-Month Manuscript of the Interstate Primary Policy, the Alternus Follow-On Endorsement  may only supersede the terms of the manuscript policy if identified in Endorsement 9 by an insurer, and it is added on only with respect to the individual insurer which identified it.  Id. ¶¶ 65-66.

---

[3] For Exhibits E through K, due to each containing several documents, each with its own separate pagination, the citations use the CM/ECF page numbers.

[9]

## 2. Endurance

On September 12, 2023, Endurance notified Gate via letter that it denied coverage for Gate's alleged COVID-19 losses. Id. ¶ 85. Endurance relied on three policy exclusions to deny coverage. Id.

Endurance relied on a "Communicable Disease Exclusion," found in the Endurance Policy, which excludes any loss arising from "the actual or alleged transmission of a 'communicable disease'." Id. ¶ 86; see also Am. Compl., Ex. G ("Endurance Policy") 12, ECF. No. 52-7.

Endurance further reserved its rights to rely on a pollution exclusion, entitled "Seepage and/or Pollution and/or Contamination Exclusion," which appears as Endorsement 1 in the 12 Month Manuscript and states that the insurance policy does not insure against loss in connection with "any kind or description of seepage and/or pollution and/or contamination," and on a Nuclear, Biological or Chemical Incident exclusion, "War and Military Action, Terrorism and Nuclear, Biological or Chemical Exclusion," which excludes coverage of "[a]ny incident involving the threat or actual use, release or escape of pathogenic or poisonous biological or chemical materials," among other exclusions. Id. ¶¶ 89, 92.

[10]

### 3.    Aspen, Evanston, and Princeton

On March 15, 2024, Aspen, Evanston, and Princeton each separately notified Gate via letter that they were denying coverage for Gate's alleged COVID-19 losses. Id. ¶¶ 104, 119, 134.  In support of their denials, Aspen, Evanston, and Princeton gave the same four reasons: (1) the companies disagreed that the Loss of Attraction coverage had been triggered; (2) the Manuscript's Pollution Exclusion bars coverage of Gate's alleged COVID losses; (3) Gate's losses do not meet Aspen, Evanston, or Princeton's attachment point; and (4) a Loss of Attraction "sublimit" operates to preclude coverage for Gate's alleged losses. Id.

The "Seepage and/or Pollution and/or Contamination Exclusion," cited by Aspen, Evanston, and Princeton appears as Endorsement 1 in the 12 Month Manuscript and states that the policy does not insure against loss in connection with "any kind or description of seepage and/or pollution and/or contamination." Id. ¶ 89.

### 4.    Hallmark

On January 31, 2024, Hallmark notified Gate via letter that it was denying coverage of Gate's alleged COVID losses. Id. ¶ 149.  Hallmark relied upon three reasons for this decision: (1) the company disagreed that the Loss of Attraction provision had been triggered; (2) the 18 Month Manuscript's "Biological or

[11]

. Nuclear Exclusion" barred coverage for Gate's alleged losses; and (3) the 18 Month Manuscript's "Seepage and/or Pollution and/or Contamination Exclusion," also barred coverage for Gate's losses. Id. ¶¶ 149, 153.

The "Biological or Nuclear Exclusion" cited by Hallmark states that the policy shall not insure against the "unlawful possession, use, release, discharge, dispersal or disposal of any bacteriological, viral, radioactive or similar agents." Id. ¶ 153.

The "Seepage and/or Pollution and/or Contamination Exclusion," cited by Hallmark appears as Endorsement 1 in the 18 Month Manuscript, and states that the policy does not insure against loss in connection with "any kind or description of seepage and/or pollution and/or contamination." Id. ¶ 89.

## IV. ANALYSIS

### A. Pleading Standard

To withstand a motion to dismiss, a complaint must "state a claim upon which relief can be granted . . . ." Fed. R. Civ. P. 12(b)(6). The complaint must include sufficient factual allegations that, accepted as true, "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Courts must also "construe them in the light most favorable to the plaintiff." Myrick v. Fulton Cnty.,

[12]

. Georgia, 69 F.4th 1277, 1294 (11th Cir. 2023) (citing McGroarty v. Swearingen, 977 F.3d 1302, 1306 (11th Cir. 2020)).  In other words, "[t]he complaint must 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Dukes Clothing, LLC v. Cincinnati Ins. Co., 35 F.4th 1322, 1325 (11th Cir. 2022) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

"In deciding whether a complaint states a claim upon which relief may be granted, [the Court] normally consider[s] all documents that are attached to the complaint or incorporated into it by reference," as "part of the pleading for all purposes."  MSP Recovery Claims, Series LLC v. Metropolitan Gen. Ins. Co., 40 F.4th 1295, 1303 (11th Cir. 2022) (quoting Gill ex rel. K.C.R. v. Judd, 941 F.3d 504, 511 (11th Cir. 2019)); see also Cranford v. Nevada Dep't of Corr., 398 F. App'x 540, 546 (11th Cir. 2010) ("The analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto.") (quoting Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1368-69 (11th Cir. 1997)).

**B.    Florida Contract Law Principles as Applied to Insurance Policies**

"Under standard common law principles, '[c]ontract interpretation is generally a question of law.'"  Fernandez v.

[13]

Seaboard Marine LTD., 135 F.4th 939, 951 (11th Cir. 2025) (quoting Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd., 882 F.3d 1033, 1039 (11th Cir. 2018)).  The same approach generally applies in the context of insurance policies: "It is well settled that the construction of an insurance policy is a question of law for the court."  Public Risk Mgmt. of Fla. v. Munich Reinsurance Am., Inc., 38 F.4th 1298, 1304 (11th Cir. 2022) (quoting Jones v. Utica Mut. Ins. Co., 463 So. 2d 1153, 1157 (Fla. 1985)): see also Feaz v. Wells Fargo Bank, N.A., 745 F.3d 1098, 1104 (11th Cir. 2014) (citing Moore v. Pennsylvania Castle Energy Corp., 89 F.3d 791, 795-96 (11th Cir. 1996)).

"A claim for breach of contract under Florida law requires three elements: '(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach.'"  Cafe Int'l Holding Co. LLC v. Westchester Surplus Lines Ins. Co., 536 F. Supp. 3d 1291, 1298 (S.D. Fla. 2021) (quoting Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1272 (11th Cir. 2009)).

Here, Gate alleges the existence of valid insurance contracts, and these allegations are not in dispute between any of the parties.  Am. Compl. ¶¶ 12-21.  The same can be said about the Gate's allegations that the Defendant Insurers denied

[14]

. the payments after being notified about Gate's claims.  Id. ¶¶ 39, 58-60, 63, 85, 104-105, 119-120, 134-135, 149-150.

"When the parties dispute coverage and exclusions under a policy, a burden-shifting framework applies." Graspa Consulting, Inc. v. United Nat'l Ins. Co., No. 20-23245-CIV, 2021 WL 1540907, at *4 (S.D. Fla. Apr. 16, 2021).  "Florida law places on the insured the burden of proving that a claim against it is covered by the insurance policy." Public Risk Mgmt. of Fla., 38 F.4th at 1304 (quoting LaFarge Corp. v. Travelers Indem. Co., 118 F.3d 1511, 1516 (11th Cir. 1997)).  As for any exclusions provided in a policy, however, "[t]he burden rests on the insurer to show that exclusions in a policy apply." Burlington Ins. Co. v. Normandy Gen. Partners, 560 F.App'x 844, 847 (11th Cir. 2014) (citing U.S. Concrete Pipe Co. v. Bould, 437 So. 2d 1061, 1065 (Fla. 1983)).  "When a policy's exclusion contains an exception, . . . , the insured must shoulder the burden of demonstrating that the exception applies." New S. Commc'ns, Inc. v. Houston Cas. Co., 835 F.App'x 405, 413 (11th Cir. 2020) (citing East Fla. Hauling, Inc. v. Lexington Ins. Co., 913 So. 2d 673, 678 (Fla. 3d DCA 2005)).  Put another way, "[u]nder Florida law, the insured has the burden of proving a claim is covered by the insurance policy, the insurer has the burden of proving an exclusion to coverage, and the insured also has the burden of proving an exception to a policy exclusion."

[15]

. Bahama Bay II Condo. Ass'n, Inc v. United Nat'l Ins. Co., 374 F. Supp. 3d 1274, 1282 (M.D. Fla. 2019) (Mendoza, J.) (internal citation omitted).

As for the interpretation of the provisions, "[u]nder Florida law, an insurance policy is a contract, and ordinary contract principles govern its interpretation and construction." State Farm Mut. Auto. Ins. Co. v. Spangler, 64 F.4th 1173, 1178 (11th Cir. 2023) (citing American Strategic Ins. Co. v. Lucas-Solomon, 927 So. 2d 184, 186 (Fla. 2d DCA 2006)).

Importantly, "[t]he scope and extent of a policy's coverage is defined by the language and terms of the policy, and where the language of a policy is plain and unambiguous, the policy must be enforced as written." Id. at 1178-79 (citing Allstate Ins. Co. v. Orthopedic Specialists, 212 So. 3d 973, 975-76 (Fla. 2017)). "However, if the asserted policy language is susceptible of more than one reasonable interpretation, the policy is considered ambiguous and strictly construed against the policy's drafter." Berkley Assurance Co. v. Expert Grp. Int'l Inc., No. 8:16-CV-3466-T-02JSS, 2018 WL 4635638, at *4 (M.D. Fla. Sept. 27, 2018) (Jung, J.) (citing Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000), aff'd, 779 F.App'x 604 (11th Cir. 2019)).

That rule applies, however, "[o]nly when a genuine inconsistency, uncertainty, or ambiguity in meaning remains

[16]

. after resort to the ordinary rules of construction." <u>Deni Assocs. of Fla., Inc.</u> v. <u>State Farm Fire & Cas. Ins. Co.</u>, 711 So. 2d 1135, 1138 (Fla. 1998) (quoting <u>Excelsior Insurance Co.</u> v. <u>Pomona Park Bar & Package Store</u>, 369 So. 2d 938, 942 (Fla. 1979)). "The Court cannot rewrite the terms of the policy." <u>Summit Contractors, Inc.</u> v. <u>Crum & Forster Specialty Ins. Co.</u>, 76 F. Supp. 3d 1381, 1388 (M.D. Fla. 2015) (Kovachevich, J.), <u>aff'd sub nom.</u> <u>Summit Contractors, Inc.</u> v. <u>Crum & Forster Speciality Ins. Co.</u>, 633 F.App'x 785 (11th Cir. 2016).

"[I]nsurance coverage must be construed broadly and its exclusions narrowly." <u>Mena Catering, Inc.</u> v. <u>Scottsdale Ins. Co.</u>, 512 F. Supp. 3d 1309, 1316 (S.D. Fla. 2021) (quoting <u>Evanston Ins. Co.</u> v. <u>Budget Grp. Inc.</u>, 199 F.App'x. 867, 868 (11th Cir. 2006)). At the same time, "policies 'are to be construed most strongly against the insurer and liberally in favor of the insured,'" <u>id.</u>, and "[e]xclusionary clauses are construed even more strictly against the insurer than coverage clauses." <u>Berkley Assurance</u>, 2018 WL 4635638, at *4 (citing <u>Auto-Owners Ins. Co.</u>, 756 So. 2d at 34); <u>see also</u> <u>Southern-Owners Ins. Co.</u> v. <u>MAC Contractors of Fla., LLC</u>, 768 F.App'x 970, 972 (11th Cir. 2019) ("Furthermore, '[b]ecause they tend to limit or avoid liability, exclusionary clauses are construed more strictly than coverage clauses.'") (quoting <u>Category 5</u>

[17]

. Mgmt. Grp., LLC v. Companion Prop. & Cas. Ins. Co., 76 So. 3d 20, 23 (Fla. 1st DCA 2011)).

With the above framework in mind, the Court proceeds.

**C.    Gate's Failure to Plead an Actionable Claim as to the Joint Movants**

The Joint Movants (Evanston, Aspen, Princeton and Hallmark) argue in their motion to dismiss that Gate failed "to properly plead an actionable claim under the Loss of Attraction insuring provision." Defs.' Am. Joint Mot. Dismiss 4. Instead, they contend, the "Amended Complaint asserts in conclusory fashion" that the coverage was triggered because hundreds of thousands of individuals manifested the COVID-19 disease at or within 50 miles of Gate's premises and Gate sustained actual losses from these manifestations; at the same time, Gate "fails to allege a single instance of a manifestation at any covered location, much less any loss resulting from such manifestation." Id. at 3-4; see Am. Compl. ¶¶ 33-38.

The Joint Movants are correct and their motion to dismiss is allowed on that basis.

As prescribed by the rules restated above, "the burden is on [Gate] to prove facts that bring its claim within an insurance policy's affirmative grant of coverage." Royal Palm Optical, Inc. v. State Farm Mut. Auto. Ins. Co., 530 F. Supp. 3d 1175, 1180 (S.D. Fla. 2021) (citing Berkower v. USAA Cas. Ins.

[18]

_Co._, No. 15-23947-CIV, 2017 WL 1250419, at *7 (S.D. Fla. Apr. 4, 2017)) _aff'd,_ No. 21-11335, 2022 WL 1666967 (11th Cir. May 25, 2022); _see also_ _Homeowners Choice Prop. & Cas._ v. _Miguel Maspons_, 211 So. 3d 1067, 1068 (Fla. 3d DCA 2017). At the same time, to survive a motion to dismiss, the "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." _Twombly_, 550 U.S. at 545. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . .", plaintiff is still required to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." _Id._ at 555 (internal citation omitted).

Here, Gate claims coverage under the respective policies' "Loss of Attraction" provision, Section 8.L.(1), which states that the "policy covers the Actual Loss Sustained by the Insured during a period of liability from: (1) Infectious or contagious disease manifested by any person while on the premises of the Insured or within a radius of 50 miles thereof; . . . ." _See_ Am. Compl., Ex. H. ("Aspen Policy") 24, ECF No. 52-8; _id._, Ex. I ("Evanston Policy") 27, ECF No. 52-9; _id._, Ex. J ("Princeton Policy") 19, ECF No. 52-10; _id._, Ex. K ("Hallmark Policy") 23, ECF No. 52-11.

[19]

Gate alleges its entities have suffered actual losses in excess of $73,000,000, Am. Compl. ¶ 38, which supposedly stem from "hundreds of thousands of cases of COVID . . . manifested by individuals while on Gate's premises or within 50 miles thereof, at a minimum," id. ¶ 34, at a total of one hundred and twenty-six locations, in twelve different states. Id., Ex. A, ECF No. 52-1. Gate points to a timeline between March 15, 2020, through December 31, 2021, noting that "symptoms of COVID-19 were being manifested by at least one individual" while at these locations even before March 15, 2020. Id. ¶¶ 33-34. To support that last allegation, Gate cites a peer-reviewed article: Jessica T. Davis, et al., Cryptic Transmission of SARS-CoV-2 and the First COVID-19 Wave, 600 Nature 127 (2021). Id. ¶ 33.

This Court, however, is receptive to two of the Joint Movants' arguments here. First, Gate fails to allege any **actual** losses sustained, as per policy requirements, **from** the manifestations it describes. Second, pointing to a scholarly article, which describes early proliferation of COVID-19 using a global metapopulation epidemic model, fails to alleviate that deficiency.

Gate alleges that the policies do not contain definitions of words found in the paragraph, including "Actual Loss Sustained," "from," "infectious or contagious disease," and "manifested by." Am. Compl. ¶¶ 26-29. Focusing on the word

[20]

"from" as an undefined term under the policies, the Court defers to the dictionary definition, which in the relevant part states that the word is ". . . used as a function word to indicate the source, cause, agent, or basis."[4]  That understanding aligns with the ordinary meaning and usage of the word.[5]  It also makes sense in the broader context of the Loss of Attraction section of the policy, which also --

> covers the Actual Loss Sustained by the Insured . . . from: (2) Actual or attempted murder or suicide occurring at the premises of the Insured; (3) Injury or illness sustained by any person arising from or traceable to foreign or injurious matter in food or drink provided on the premises of the Insured or the threat thereof; (4) Closing of the whole or part of the premises of the Insured by order of a competent public authority consequent upon the existence of threat of hazardous conditions either actual or suspected at the premises of the Insured; (5) Loss of satellite transmission signals; . . . [etc.]

See, e.g., Aspen Policy 24-25.

Here, beyond what was already mentioned above, Gate only alleges that: the "Loss of Attraction coverage was triggered when Gate began sustaining actual losses from those manifestations of COVID-19," Am. Compl. ¶ 35; "[e]ach and every separate case of COVID-19 manifested by an individual . . . was

---

[4] From, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/from (last accessed Mar 23, 2026).

[5] See Admiral Ins. Co. v. Feit Mgmt. Co., 321 F.3d 1326, 1330 (11th Cir. 2003) (holding that the term "from", when "given its plain and ordinary meaning [. . .] clearly means 'originating in'.").

[21]

a concurrent cause of and contributed to the actual losses Gate sustained during relevant time period," id. ¶ 36; "[f]rom March 15, 2020, through at least December 31, 2021, Gate sustained actual losses from COVID 19 manifested by people while on each of Gate's premises or within 50 miles thereof," id. ¶ 37, and that "[t]he actual loss sustained by Gate from COVID-19 exceeds $73 million," id. ¶ 38. While these allegations create an "impression" of causation, at no point does Gate allege **how** these manifestations actually relate to the losses claimed, i.e., how the manifestations of disease were a "cause, agent, or basis" of these losses. To the contrary, and as the Joint Movants argue, Gate's allegations seem to be "nothing more than a recitation of the policy language," Defs.' Joint Reply 1, -- the type considered insufficient under the Twombly requirements quoted above (as "a formulaic recitation of the elements of a cause of action." 550 U.S. at 555). Indeed, the relief seems to be sought as a remedy for the losses attributable to the COVID-19 pandemic in general. See Defs.' Am. Joint Mot. Dismiss at 9-10. To qualify for coverage, however, the "Actual Losses Sustained" need to arise "from . . .[i]nfectious or contagious disease manifested by any person on the premises . . . ."[6] See,

---

[6] Cf. BBX Cap. Corp. v. Scottsdale Ins. Co., 713 S.W.3d 590, 621-22 (Mo. Ct. App. 2025) ("BBX has to allege a closure of or restriction of access to an Insured Premises by a government or local authority **directly as a result** of COVID-19 which was

[22]

*e.g.*, Aspen Policy 24-25.  In that context, the lack of allegations as to any specific manifestations of disease at any of Gate's premises, although not harmful *prima facie*, becomes fatal for alleging any causal link between alleged Actual Losses Sustained and the manifestations of disease at the requisite locations.  To make matters worse, Gate does not point the Court to any statement, declaration, or research or calculation (internal or external) that could help show any such connection.

For the same reasons, Gate's reliance on Mandarin Oriental is misplaced.  The policy in that case was ". . . extended to cover loss resulting from interruption of or interference with the business carried on by the Insured in consequence of: (a) Infectious or contagious disease manifested by any person while on the premises of the Insured or within a radius of 5 miles thereof."  Mandarin Oriental, Inc. v. HDI Glob. Ins. Co., No. 23 CIV. 4951 (JPC), 2024 WL 4252562, at *1 (S.D.N.Y. Sept. 19, 2024).

While the wording of the policy in that case bears resemblance to the one at hand, there were crucial differences that allowed the court to find the pleadings sufficient.  The

---

manifested by a person whilst on or within any Insured Premises. BBX has not done so." (emphasis added)), reh'g denied (Apr. 29, 2025), transfer denied (July 1, 2025).

complaint in <u>Mandarin</u> alleged "the specific date of '[t]he first Covid-19 manifestation in any person within a 5-mile radius of' each of the four hotels [;] that these hotels 'were impacted by the COVID-19 pandemic and the attendant manifestations of COVID-19 . . . '[;] 'the extensive and ongoing loss of business income sustained by Mandarin as a result of COVID-19 manifestations . . . ' [;] 'the knowledge that the hospitality industry was one of the hardest hit sectors by COVID-19' [; and] specific monetary amounts of 'business interruption/interference losses' incurred at each of the four hotels . . . ."[7]  <u>Id.</u> at *4.

Here, the Court is left to speculate as to that part of Gate's pleading.

Thus, the Court ALLOWS the Joint Movants' motion to dismiss.[8]  Considering it is Gate's second attempt at pleading

---

[7] What also distinguishes the <u>Mandarin Oriental</u> case is that, unlike the case here, the court did not have the full insurance contracts before it and was "unable to assess what level of causation would be consistent with 'the reasonable expectation of the average insured' in this context."  <u>Id.</u> at *5.  The reasonable expectation doctrine has been rejected by Florida courts and cannot be considered in the foregoing analysis.  <u>See</u> <u>Deni Assocs. of Fla., Inc.</u> v. <u>State Farm Fire & Cas. Ins. Co.</u>, 711 So. 2d 1135, 1140 (Fla. 1998); <u>see also</u> <u>Chalfonte Condo. Apartment Ass'n, Inc.</u> v. <u>QBE Ins. Corp.</u>, 695 F.3d 1215, 1226 (11th Cir. 2012).

[8] While the Joint Movants also argued policy exclusions, "[i]n light of the Court's ruling as to the Policy's threshold grant of coverage, the Court need not address the applicability of any of the Policy's exclusions."  <u>Royal Palm Optical, Inc.</u> v. <u>State Farm Mut. Auto. Ins. Co.</u>, 530 F. Supp. 3d 1175, 1183 n.8 (S.D. Fla. 2021), <u>aff'd,</u> No. 21-11335, 2022 WL 1666967 (11th Cir. May 25, 2022).

[24]

its claims against the Joint Movants, this Court dismisses them WITH PREJUDICE.

### D.    Policy Exclusions

Defendant Insurers who did not attack the sufficiency of Gate's allegations, rely instead on policy exclusions which they argue eliminate the coverage for the type of losses Gate seeks to recover.  Endurance Mot. Dismiss 8-9; Interstate Mot. Dismiss 9-10.

Gate, in response, contests the applicability of some of the exclusions and argues otherwise that such exclusions render the coverage ambiguous or illusory.  Am. Compl. ¶¶ 72, 95; Gate's Opp'n Interstate's Mot. Dismiss 4, 21-22; Gate's Opp'n Endurance's Mot. Dismiss 15.  This Court addresses these arguments in turn, starting with applicability of the exclusions.

Generally, "[w]hen an insurer relies on an exclusion to deny coverage, it has the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation." Cincinnati Ins. v. Quorum Mgmt. Corp., 186 F. Supp. 3d 1307, 1316 (M.D. Fla. 2016) (Hodges, J.) (quoting Acosta, Inc. v. National Union Fire Ins. Co., 39 So. 3d 565, 574 (Fla. 1st DCA 2010).  Where "the relevant policy language is susceptible to more than one reasonable interpretation, one

[25]

providing coverage and the [other] limiting coverage, the insurance policy is considered ambiguous." Id. (quoting Auto-Owners Ins. Co., 756 So. 2d at 34). "Ambiguous policy provisions are interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy." Id. "Likewise, ambiguous insurance policy exclusions are construed against the drafter and in favor if the insured." Id.

### 1. Pollution Contamination Exclusion -- Interstate

#### a. The Interstate Primary Policy Properly Incorporates the Alternus Follow-On Endorsement

Interstate, in its denial of coverage, relied on the Alternus Follow-On Endorsement, which contains, as one of the exclusions the Pollution Contamination Exclusion. See Am. Compl. ¶ 64; Interstate Primary Policy 53; Interstate Excess Policy 54. Gate disputes that the Exclusion would bar the coverage only indirectly; it first argues that the Alternus Follow-On Endorsement was not properly incorporated into the Interstate Primary Policy, thus invalidating a potential exclusion of coverage. Am. Compl. ¶ 65. Interstate disagrees. Interstate Mot. Dismiss 9-12. The Court concludes that the Alternus Follow-On Endorsement was properly incorporated, and its exclusion, if applied, eliminates the coverage claimed by Gate.

[26]

The arguments here, again, involve questions of contract interpretation.  "In Florida, the question of whether a contract validly incorporates another document is a question of law." Calderon v. Sixt Rent a Car, LLC, 114 F.4th 1190, 1202 (11th Cir. 2024) (citing Avatar Props., Inc. v. Greetham, 27 So. 3d 764, 766 (Fla. 2d DCA 2010)).

> Florida law provides that: 'To incorporate by reference a collateral document, the incorporating document must (1) specifically provide "that it is subject to the incorporated [collateral] document" and (2) the collateral document to be incorporated must be "sufficiently described or referred to in the incorporating agreement" so that the intent of the parties may be ascertained.'

Calderon, 114 F.4th at 1201 (quoting BGT Grp., Inc. v. Tradewinds Engine Servs., LLC, 62 So. 3d 1192, 1194 (Fla. 4th DCA 2011) (internal citation omitted)).

The crucial question here is whether the Alternus Follow-On Endorsement was "sufficiently described or referred to in the incorporating agreement."  Id.

Endorsement 9 of the Interstate Primary Policy lists, among other attached forms, only the "Allianz U.S. Market Follow-On Endorsement – 10% Facility", and not the "Alternus-MFOE-NA(4-17) US Market Follow-On Endorsement."  Interstate Primary Policy 48. Interstate argues that the mistake in the naming does not matter for the interpretation; it calls it a "swap" of words, Interstate Mot. Dismiss 11, and a typographical error, Joint

[27]

Reply Interstate & Endurance 5.  It also refers to the "Titles of Paragraphs" provision contained in the policy, Interstate Primary Policy 33, which states that "[t]he titles of paragraphs of this form and of endorsements and supplemental contracts, if any, now or hereafter attached hereto are inserted solely for convenience of reference and shall not be deemed in any way to limit or affect the provisions to which they relate." Interstate Mot. Dismiss 6, 11.  Gate responds that it does not rely upon the titles of the endorsements listed for interpretation but does so "to identify what endorsements are incorporated into the Interstate Policies," and since the names are clearly different, substituting one name for the other would amount to the Court rewriting the contract in a ruling on a motion to dismiss.  Gate's Opp'n Interstate's Mot. Dismiss 6 (emphasis omitted).  Undeniably, the Alternus Follow-On Endorsement is the only Market Endorsement that is attached to the Interstate Primary Policy.  Interstate Mot. Dismiss 12; Interstate Primary Policy 51.  Notably, it is not clear whether the Allianz Follow-On Endorsement, as a separate and different document, even exists; it is nowhere to be found in Gate's attached exhibits, and according to Gate's interpretation, it would have to be incorporated into the policy.  Joint Reply Interstate & Endurance 5.  Moreover, the General Declarations section of the Policy lists Alternus-MFOE-NA(4-17) described as

[28]

"US Market Follow-On Endorsement ENDT # 1" as one of the forms attached at inception (and not "Allianz U.S. Market Follow-On Endorsement – 10% Facility"). Interstate Primary Policy 5. Thus, there is no alternative, reasonable interpretation of this provision.

Considering all the above[9] the Court concludes that the Alternus Follow-On Endorsement was sufficiently referred to in the incorporating agreement and thus successfully incorporated.

### b.    Application of the Exclusion

The Alternus Follow-On Endorsement contains the following exclusion:

> 5. EXCLUSIONS CLAUSE:
>
> We will not pay for loss, damage, cost or expense caused directly or indirectly by any of the following sub-classes A through I, inclusive, and any such loss, damage, or expense is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss, and the terms and conditions of coverage shall be limited or adjusted as may be provided for in the following sub-classes A through I, inclusive:
>
> . . .
>
> B. Pollution Contamination Exclusion

---

[9] Interstate also (at least implicitly) argues that the Interstate Excess Policy correctly identifies the Alternus-MFOE-NA(4-17) US Market Follow-On Endorsement in its respective Endorsement 9. Interstate Mot. Dismiss 6-7, 12 (citing Interstate Primary Policy 51 and Interstate Excess Policy 52); Joint Reply Interstate & Endurance 5. Whether the other policy, which was signed months apart, properly mentioned and incorporated the endorsement has no bearing on this analysis, which is limited to the Interstate Primary Policy.

[29]

> The release, migration, discharge, escape or dispersal of Contaminants.
>
> . . .
>
> In this exclusion B, the capitalized term "Contaminants" means materials that may be harmful to human health and include any . . . pathogen or pathogenic organism, disease-causing or illness-causing agent, . . . virus . . .

Interstate Primary Policy 53; Interstate Excess Policy 54.

Endurance argues this exclusion eliminates the coverage for the Loss of Attraction sustained from infectious or contagious disease manifested by any person, as "it bars coverage for losses 'caused directly or indirectly by' 'Contamination,' which is defined as including 'virus[es],' 'regardless of any other cause or event that contributes concurrently or in any sequence to the loss.'" Interstate Mot. Dismiss 10. Gate does not dispute that particular argument. See Am. Compl. ¶¶ 64-65; Gate's Opp'n Interstate's Mot. Dismiss 3-9.

The Pollution Contamination Exclusion, read plainly, provides a broad exclusion for any losses related in any way to the "release, migration, discharge, escape or dispersal of Contaminants," the latter term being defined as to cover any form of contagion. Losses from manifestations of infectious disease (here, COVID-19) are closely tied at least to the "migration" of a virus. If applied, this exclusion precludes Gate's claims related to the Interstate Policies.

[30]

### 2. Communicable Disease Exclusion -- Endurance

Endurance argues that the Communicable Disease Exclusion provided in its policy bars coverage for Gate's COVID-19 related losses, and, therefore, Gate's claims should be dismissed. Endurance Mot. Dismiss 8-9, 23-24.

The Endurance Policy contains an endorsement that introduces an exclusion that bars coverage for losses attributable to communicable diseases.  It provides, in pertinent part:

COMMUNICABLE DISEASE EXCLUSION

. . .

This Policy excludes any loss, expense, cost or damage directly or indirectly arising out of, contributed to by, or resulting from, in whole or in part, the actual or alleged transmission of a "communicable disease", or threat thereof, including any cost or expense arising out of or related to testing for, prevention of, failure to report the disease to governmental authorities, monitoring, cleaning up, removing, containing, treating, or neutralizing the "communicable disease".

"Communicable disease", as used in this endorsement, means any sickness or malady capable of being transmitted.

All other terms and conditions of this policy shall remain unchanged.

See Endurance Policy 12; Endurance Mot. Dismiss 5-6.

As stated above, under Florida Law "in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." Auto-Owners Ins. Co., 756 So. 2d at 34 (internal citations

[31]

omitted).  Furthermore, "[a] contract is not to be read so as to make one section superfluous, and so all the various provisions of a contract must be so construed as to give effect to each." Universal Prop. & Cas. Ins. Co. v. Johnson, 114 So. 3d 1031, 1036 (Fla. 1st DCA 2013) (citation modified).  Finally, a contract will not be interpreted "in such a way as to render [a] provision[] meaningless when there is a reasonable interpretation that does not do so." Moore v. State Farm Mut. Auto. Ins. Co., 916 So. 2d 871, 877 (Fla. 2d DCA 2005).

Here, as for the exclusion itself, it broadly bars "any loss, expense, cost or damage directly or indirectly arising out of, contributed to by, or resulting from, in whole or in part, the actual or alleged transmission of a 'communicable disease,'" which is defined as "any sickness or malady capable of being transmitted." See Endurance Policy 12.  As Gate's claims are based on the Loss of Attraction coverage tied to the losses from COVID-19 manifested by any person, which is a sickness capable of being transmitted, these losses fall squarely within this exclusion.[10]

---

[10] Gate contends that because the exclusion in question "expressly states that all other terms and conditions of the Endurance Policy remain unchanged," it "cannot eliminate Endurance's express obligations to cover Gate" for Loss of Attraction.  Am. Compl. ¶ 88.  Gate's argument, however, defies not only the rules of contract interpretation and construction, but also common sense.  Providing in an endorsement that "all other terms and conditions" of a policy remain unchanged can

[32]

### 3.    Illusory Coverage Argument

To overcome the possibility that the exclusions would bar the coverage for its losses, Gate argues in its amended complaint, in relation to both the Interstate and Endurance policies, that applying the exclusions would either: 1) "swallow" the "insuring provisions for actual loss sustained from infectious or contagious disease manifested by any person . . . thereby creating the grossest form of ambiguity", or 2) eliminate such granted coverage, "render[ing] the contagious disease insuring provisions . . . illusory." Am. Compl. ¶¶ 71-72; 94-95.  Interstate and Endurance argue to the contrary that the coverage remains available under other subsections of the Loss of Attraction provision and is thus not illusory. Interstate Mot. Dismiss 20; Endurance Mot. Dismiss 17.  Though the parties committed significant portions of their briefs to these issues, the arguments are mostly the same and can thus be discussed together.

The Eleventh Circuit distilled the existing case law and explained that there are two situations in which an insurance

---

only reasonably mean that the endorsement introduces a change that it says it does and not any other, i.e. it only adds an exclusion.  To conclude otherwise would amount to giving the endorsement no meaning whatsoever (as Endurance argues; see Endurance Mot. Dismiss at 12), or worse -- an absurd, internally contradictory meaning, that flies in the face of the rules expressed in Deni that "insurance policies will not be construed to reach an absurd result."  711 So. 2d. at 1140.

[33]

policy can be considered illusory under Florida law. American Cas. Co. of Reading, Pennsylvania v. Belcher, 709 F.App'x 606, 610 (11th Cir. 2017); see also Posada v. Aspen Specialty Ins. Co., No. 8:22-CV-1578-CEH-AAS, 2023 WL 2711538, at *16 (M.D. Fla. Mar. 30, 2023) (Honeywell, J.).

The first situation is based on an ambiguity analysis. "[W]hen a policy exclusion does swallow up an insuring provision, the Florida Courts conclude that the policy is ambiguous, and resolve that ambiguity by ignoring the exclusion." Zucker for BankUnited Fin. Corp. v. U.S. Specialty Ins. Co., 856 F.3d 1343, 1352 (11th Cir. 2017) (internal citations omitted); see also Belcher, 709 F. App'x at 610. For an ambiguity of this type to arise, the "coverage provision and [the] exclusion [would have to be] directly at odds, 'leaving the insured to wonder which provision correctly explained the scope of his coverage.'" Travelers Indem. Co. of Connecticut v. Richard Mckenzie & Sons, Inc., 10 F.4th 1255, 1265 (11th Cir. 2021) (quoting Zucker, 856 F.3d at 1352). In other words, "[a]n insurance policy cannot grant rights in one paragraph and then retract the very same right in another paragraph called an 'exclusion.'" Tire Kingdom, Inc. v. First S. Ins. Co., 573 So. 2d 885, 887 (Fla. 3d DCA 1990) (citing Moore v. Connecticut Gen. Life Ins. Co., 277 So. 2d 839 (Fla. 3d DCA 1973), cert. denied, 291 So. 2d 204 (Fla. 1974)).

[34]

As an example of the application of this type of illusory coverage, the Circuit court observed in Belcher, where the policy provided a higher payout limit for aggregate claims, that "if the 'related claims' definition were so broad that the aggregate limit could literally never be invoked, the right to collect up to the aggregate limit would be illusory." 709 F. App'x. at 610; see also Purelli v. State Farm Fire & Cas. Co., 698 So. 2d 618, 619-20 (Fla. 2d DCA 1997) (holding that an insurance was ambiguous in that it "purport[ed] to insure invasion of privacy, an intentional tort, but exclude[d] acts 'intended' by the insured and limit[ed] coverage to 'accidents.'"); Certain Underwriters at Lloyds, London Subscribing to Pol'y No. SA 10092-11581 v. Waveblast Watersports, Inc., 80 F. Supp. 3d 1311, 1318-19 (S.D. Fla. 2015) (holding in the context of a policy that contained a "special endorsement for parasail operations" and a watercraft exclusion that "[p]roviding an extension of coverage for parasailing activities except where it arises out of the use of watercraft is, indeed, complete nonsense," concluding that "[s]uch a reading would render the policy illusory, and the Court adopts the only reading consistent with reason and probability -- that the watercraft exclusion does not preclude coverage for parasailing activities." (citation omitted)).

[35]

The second situation is based on the common-law doctrine of illusory coverage, which is triggered when an exclusion or limitation "eliminate[s] all -- or at least virtually all -- coverage in a policy." Zucker, 856 F.3d at 1352; see also Interline Brands, Inc. v. Chartis Specialty Ins. Co., 749 F.3d 962, 966-67 (11th Cir. 2014)). The Eleventh Circuit restated the distinctiveness of these two doctrines, emphasizing that "[c]overage is illusory under Florida law only if the insurance policy grants coverage with one hand and then with the other completely takes away the entirety of that same coverage. Completeness is key." Mckenzie, 10 F.4th at 1265.

As the Eleventh Circuit in Mckenzie instructively observed that

> . . . there is a dispositive difference between complete contradiction or complete negation and merely excepting some or many or even most things from coverage. Coverage is not illusory if the policy simply excludes coverage for a **subset** of claims that would ordinarily fall within the policy's insuring provisions. And an exclusion that completely swallows coverage is not the same as one that takes a nibble, or even a big bite, out of it. Exclusions can be significant without completely contradict[ing] the insuring provisions.

Mckenzie, 10 F.4th at 1266 (quotations omitted) (emphasis, alteration in original).[11]

---

[11] The Eleventh Circuit further observed that "an insurance policy can both provide coverage and also exclude some things that might otherwise fall within that coverage. That is not a conflict. It's just an exclusion, and those are par for the insurance course." Id. at 1265 (citing Cynergy, LLC, v. First

This Court concludes here that, if applied, the exclusions would render the respective Interstate and Endurance Policies ambiguous.  The exclusions are, therefore, unenforceable.

The policies purport to grant coverage for "the Actual Loss Sustained by the Insured during a period of liability from . . . [i]nfectious or contagious disease manifested by any person while on the premises of the Insured or within a radius of 50 miles thereof."  18-Month Manuscript 16-17; 12-Month Manuscript 16-17.  Interstate's Pollution Contamination Exclusion and Endurance's Communicable Disease Exclusion, however, take this particular express grant of right, provided in a section of a policy titled and dedicated to "Coverage Extensions" no less, away -- in whole and leaving nothing behind.  See Tire Kingdom, 573 So. 2d at 887; Posada, 2023 WL 2711538, at *19.

As this Court noted above, Interstate's Pollution Contamination Exclusion eliminates coverage for losses in any way related to "[t]he release, migration, discharge, escape or dispersal of Contaminants," which are in turn broadly defined to encompass any materials, pathogens or "disease-causing or illness-causing agent."  Interstate Primary Policy 53; Interstate Excess Policy 54.  Thus, a situation arises that

_____

Am. Title Ins. Co., 706 F.3d 1321, 1327 (11th Cir. 2013)). Admittedly, the two doctrines do not seem to have sharply defined boundaries which can lead to an overlap, as the analysis in Mckenzie shows.

[37]

brings this case close to <u>Waveblast Watersports</u> -- any and all infectious or contagious diseases that could be manifested by a person "necessarily involve[]" vectors that can cause them, which here are all excluded.  <u>See</u> 80 F. Supp. 3d at 1319 (concluding that a policy extending coverage to parasailing activities "except where it arises out of the use of watercraft" is illusory).  Endurance's Communicable Disease Exclusion is similarly expansive and arguably even more directly on point in its elimination of coverage as it excludes losses related to any "communicable disease", defined as "any sickness or malady capable of being transmitted."  Endurance Policy 12.  Considering the breadth of these exclusions, there is no conceivable way that Gate could claim coverage for losses sustained from any such manifestations, because any possible scenario giving rise to such losses is precluded.[12]

---

[12] Gate makes an additional argument that since the Interstate Primary and Excess Policies also contain contamination exclusions ("Endorsement 1 Contamination Exclusion"), which do not define the word "contamination", alongside the Pollution Contamination Exclusion, which does define "contaminants," an ambiguity is created, which under Florida law must be resolved in favor of Gate.  Am. Compl. ¶¶ 68-70; <u>see</u> Interstate Primary Policy 34; Interstate Excess Policy 34.  Considering that this Court already has concluded that the application of the Pollution Contamination Exclusion renders the policy ambiguous, it does not need to address this argument.

It can be noted, however, that "[a]lthough language in a policy is ambiguous if susceptible to more than one reasonable interpretation, the fact that a policy term is undefined does not necessarily mean the term is ambiguous."  <u>Spangler</u>, 64 F.4th

[38]

The exclusions introduce the type of ambiguity under Florida law that requires this Court to read the insurance policy in favor of coverage, disregarding the exclusions as unenforceable.  See Zucker, 856 F.3d at 1352.

In so doing, this Court rejects Interstate's and Endurance's arguments that the Exclusions bar coverage under their respective policies and DENIES their respective motions to dismiss.

---

at 1179(citing State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So. 2d 1072, 1076 (Fla. 1998)).  As the Eleventh Circuit observed, "[s]ometimes drafters **do** repeat themselves and **do** include words that add nothing of substance."  Heyman v. Cooper, 31 F.4th 1315, 1322 (11th Cir. 2022) (emphasis in original) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 176 (2012)).  The Court agrees with Interstate that the undefined word "contamination" in the Endorsement 1 Contamination Exclusion may be read more narrowly or broadly than the defined word "contaminant" in the Pollution Contamination Exclusion, in which case they may partially overlap.  See Interstate Mot. Dismiss 14.  Nevertheless, the coexistence of these two exclusions does not create a conflict.  Id.  Applying these two exclusions together, there is no reasonable interpretation that would result in a coverage being found for Gate's losses here.  See Interline Brands., 749 F.3d at 966 (11th Cir. 2014) ("Even assuming -- for the sake of argument -- that the Exclusion is ambiguous, we reject Interline's contention that it would be void. [. . .] [I]n this case there is no construction that would provide coverage . . .").  This is especially true since in its coverage denial, Interstate relies on the Pollution Contamination Exclusion -- that, as discussed, defines the term "contaminant," which is essential for this exclusion to operate -- in such a manner as to effectively bar the coverage granted.  Thus, the policy cannot be considered ambiguous in the sense that it might be interpreted to save the exclusion.

[39]

## V.    CONCLUSION

For the reasons stated above: (1) the Joint Motion to Dismiss, ECF No. 80, is hereby **ALLOWED,** and Counts VI through XIII of the amended complaint are **DISMISSED with PREJUDICE;** (2) the Endurance Motion to Dismiss, ECF No. 82, and the Interstate Motion to Dismiss, ECF No. 83, are each **DENIED.**

**SO ORDERED.**

_____
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[13]

---

[13] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 48 years.

[40]